HOWLAND Appellant, *agt.* AYRES AND OTHERS.

*Questions discussed.*

1. Whether the *power of attorney* executed by Charles Green, a judgment creditor claiming surplus funds in this cause, to his brother Walter C. Green, was in form and terms sufficient to authorize the latter to make an *assignment* of the judgment of Charles Green, or to make an accord and satisfaction as to the judgment, and the claims of Charles Green on the surplus funds in court?

This cause came before Murray Hoffman, Esq., (then) assistant vice chancellor of the first circuit, upon exceptions to a master's report, as to the rights of the claimants in the surplus moneys paid into court by the master, arising from the sale of the mortgaged premises by him, under a decree of foreclosure.

The master reported that the claimant, Charles Green, was entitled to be paid out of such surplus the sum of $484,03, the amount due to him upon the judgment recovered by him in the superior court of the city of New-York, against Hezekiah Kelly and Horace D. Forbes, docketed on the 14th day of July, 1832, as a lien thereon.

Henry W. Brentnall excepted to the report; and so, also, did Lewis Decasse and Pierre A. Miege. The assistant vice chancellor allowed the exception of the latter, and ordered that the whole of the fund then in court, amounting to $498,91, be applied to the payment of a judgment in their favor, against Hezekiah Kelly and Horace D. Forbes, provided they first paid the sum of twenty-five dollars to said Brentnall's solicitor. From this order Green appealed to the chancellor, who affirmed the same. And hence his appeal to this court.

The testimony of *Walter C. Green*, the attorney, taken before the master, is considered to be necessary to an intelligent understanding of the ground set up by Charles Green that his brother had no authority to make the assignment or settlement of the judgment in question; because, he claimed that although the power of attorney might be considered as general in one sense, that is, a general power to do all acts in a *particular business*, it did not give him authority to do any acts out of that particular business, such as to assign judgments.

*Walter C. Green*, a witness, produced, sworn, and examined, on the part of Henry W. Brentnall, deposes as follows:

I am the brother of Charles Green. I know nothing of the judgment obtained by the said Charles Green against Hezekiah Kelly and Horace D. Forbes, except that I have a vague impression of such a judgment having been rendered, which impression was derived from information received from the said Forbes. I signed the paper now produced, and marked as Exhibit No. 7, though my impression is, that the name of Henry W. Brentnall, in the second line of said paper, was not then filled in in the said paper, but that a blank was left for a name in that place.

*Question.* Will you please to state the circumstances under which that paper was signed?

*Answer.* I had been in the habit of receiving propositions of persons indebted to my brother, Charles Green, as to the settlement of them, which propositions I was in the habit of communicating to my brother. I had in this way, at several different times, received propositions from Horace D. Forbes, who represented that he was entirely insolvent. Three different representations I communicated to my brother, who declined from time to time to accept such propositions, stating, that the defendants were young men, and that he should be able to get something from Forbes, whose father-in-law was rich. Afterward, Forbes made a proposition to me to pay for the claim, fifty dollars in cash, and to give his note for twenty-seven dollars and thirty-seven cents, payable to the order of Walter C. Green. Thinking it the best that could be done I concluded to accept the proposition, and accordingly did so accept it, but without consulting with my brother or speaking to him on the subject. The money was paid by Mr. Forbes, who at the same time gave his note conformably to his proposal; and I then signed the paper now produced and marked as Exhibit No. 7, at which time, as I think, the name of Henry W. Brentnall was not in the said paper, though I am not sure. The last proposition which Forbes had made, prior to the one finally accepted, had been made about a year before. That proposition so made a year before had been communicated by me to my brother, and he

Howland *agt.* Ayres and others.

declined accepting it.   I do not know in whose handwriting the paper is, but Mr. Forbes told me it was written by him.   My brother resided in this city.   He had retired from business about two years before the signing of that paper.   I had a written power of attorney from my brother, which was lodged in the bank, which authorized me to sign checks; and I also had a power of attorney from my brother to transact his custom-house business, which was lodged in the custom-house.   I had no other written power.

*Q.* Did you act generally as your brother's agent, or what agency had you in the management of your brother's concerns?

[Mr. Manning hereupon objects to the question, and to any parol testimony as to the witness's powers, as the attorney of his brother, upon the ground that no evidence is admissible, except of a power under seal, to authorize the execution of the paper in question; but consents that the testimony be taken, subject to his objection, and reserving his right to make his objection to such evidence before the court,—Mr. Manning at the same time requiring the claimant, Mr. Brentnall, to produce a power of attorney under seal.]

*A.* While my brother was engaged in business some years ago, I was his agent for the transaction of it, and at the time wrote letters and sold goods, endorsed notes and attended to his business generally during his absence, and while he was here or at the store.   After my brother retired from business, he had an office in Broad-street, where he had a desk, and where I seldom went to see him.

*Q.* Did you endorse notes without a written power?

*A.* I presume not.

*Q.* Where is the power, if in writing?

*A.* I do not know, unless it be contained in the power lodged in the bank.

*Q.* Did you endorse notes of a business kind, not intended for your banking purposes?

*A.* I might have endorsed notes in the name of my brother for the purpose of exchange, but I am not aware of any such.

*Q.* Did you contract written engagements for your brother, and in his name?

Howland *agt.* Ayres and others.

*A.* I do not know that I did; but if I had done so, they would have been complied with.

*Q.* Did you buy goods, in your brother's name, on a credit?

*A.* Yes, sir.

*Q.* Who gave the notes?

*A.* Probably my brother: merchants understood, generally, that I was transacting business for him. And I do not recollect that I ever gave notes on purchases, and I presume I did not, as I was in the habit of always consulting him. I endorsed notes for my brother for banking purposes, but I do not recollect that I ever gave notes. I was in the habit of always consulting my brother on the purchase of goods, and in transacting the other business.

*Q.* Were contracts or agreements entered into between merchants and yourself ratified by Charles Green?

*A.* Yes, sir. All agreements for the purchase of goods were ratified by him. I made no contracts or agreements, except for the sale or purchase of goods.

*Q.* Were you a partner of your brother?

*A.* No, sir; I was not.

*Q.* How came you to be the medium of communication between Mr. Forbes and your brother.

*A.* For the last two or three years my brother has not been in business, nor have I. I boarded up town, and on coming down to the post-office in the morning I would occasionally meet Mr. Forbes, and as we knew each other personally, he having seen me in my brother's store, we spoke of the claim, I asking him why he did not settle it. He then would tell me a long story of his poverty, and ended by making me an offer. When the last offer was made by him, I considered that my brother would probably do nothing with the claim until it was outlawed; that it was worth nothing, and being in want of money myself, I concluded to accept it.

[Adjourned to 14th January, 1836, at 11 A. M., at which time Mr. Manning, Mr. Seely, and Mr. Patten attended, and the witness's examination being resumed, he deposed as follows:]

By Mr. Seely—

*Q.* At what banks was the power of attorney, from your brother to you, lodged; and in what banks did he keep his accounts?

*A.* Originally my brother kept his account at the Bank of America. He also kept his account at the Branch Bank of the United States and the Merchants' Bank; also, the Manhattan Bank and the Tradesmen's Bank. He discontinued his accounts at the Bank of America after a short time. There were powers left at all the banks, except, I believe, the Bank of America and Tradesmen's Bank. Powers were left at the Branch Bank, Manhattan, and Merchants' Bank.

*Q.* How could you transact business at the Bank of America and the Tradesmen's Bank, without having written powers lodged there?

*A.* My impression is, that I did not draw checks upon those banks; nor transact business there as attorney for my brother.

*Q.* When was the name of Brentnall first mentioned or communicated to you, as connected with the paper or assignment marked Exhibit No. 7?

*A.* It might be that Mr. Forbes, when he made out that paper, and handed it to me, may have mentioned the name of Mr. Brentnall, but I have no recollection of it, nor have I any recollection of the name, until I came here and saw it in the assignment.

*Q.* In the negotiation between yourself and Forbes, that preceded the execution of that assignment, did Mr. Forbes negotiate as for himself and on his own account?

*A.* It was for his benefit, as I understood, entirely.

*Q.* Did you ever understand otherwise, until this assignment was exhibited here; and if so, when did you so understand otherwise?

*A.* When I saw the name of Brentnall here in the assignment was the first I ever heard of it, to the best of my present recollection.

*Q.* Did Mr. Forbes, since the execution of that assignment, ever speak of it, as a paper of his own, in the hands of Mr. Patten, as his counsel?

*A.* In a conversation which I had with Mr. Forbes relative

to this assignment, and in which I told Mr. Forbes that my brother had not assented to it, and that I was willing to return him the fifty dollars which I had received, Mr. Forbes, in reply, said it was a hard case, as he expected to be benefited by that assignment. And I think he also said, that it belonged to his brother-in-law, who was at New-Haven. He said: "I shall do nothing about it, but leave it with my lawyer." I do not recollect distinctly whether he then mentioned Mr. Patten's name.

*Q.* Did you mention to him that you had called upon his counsel Mr. Patten, and did he deny that Mr. Patten was his lawyer?

*A.* My impression is, that I stated to Mr. Forbes that I had had an interview with Mr. Patten, and had communicated to him my reasons for having accepted the fifty dollars for the debt. I inferred, from the conversation, that Mr. Patten was his counsel. I had called on Mr. Forbes in consequence of a letter I had received from Mr. Patten. This interview was induced by the letter of Mr. Patten, asking the interview with him, and was, I think, the commencement of the above-mentioned conversation with Mr. Forbes. I think the letter of Mr. Patten is destroyed.

*Q.* How long after the acceptance of the fifty dollars, and the execution of the assignment, did this conversation occur or take place with Mr. Forbes?

*A.* Within a few days after my return to this city, after an absence of about two months.

*Q.* Did Mr. Forbes, in any of these conversations in relation to this judgment, speak of his moneyed difficulties with his former partner, Mr. Kelly?

*A.* Yes, sir; in all these conversations with me he spoke of his having been deceived by his former partner, Kelly; and having had to pay large sums of money for him.

*Q.* Did he leave you to understand that the moneyed transactions and partnership dealings between him and Kelly were still unsettled?

*A.* I so distinctly inferred.

By Mr. Patten—

Howland *agt.* Ayres and others.

*Q.* Please to state how you came to know me in this transaction?

*A.* From the note which I found addressed to me or my brother; but I think it was to myself.

*Q.* Did you not receive a note from me, that Mr. Brentnall had left with me a demand for settlement or collection?

*A.* It is impossible for me to say. I know I could not comprehend it, and went to Mr. Manning to understand it. I do not recollect whether or not the name of Mr. Brentnall was mentioned in it.

*Q.* When you called on me after receiving my note, did I not tell you that Mr. Brentnall had left that demand with me for collection?

*A.* I do not recollect that any thing was said about a demand being left for collection. My object in going there was to explain to Mr. Patten my reasons for making that assignment, and accepting the fifty dollars and note in liquidation of the debt. I don't recollect that Mr. Brentnall's name was mentioned at Mr. Patten's office. I went there to state that my brother was not satisfied with the arrangement, and I was willing to explain the note to him. Mr. Brentnall's name may have been mentioned, but without my observing it, as I knew of nobody and thought of nobody in the matter but Forbes; nor should I have called on Mr. Patten, but for his having said something in the note about my liability for executing the assignment as attorney for my brother, without authority.

*Q.* How or why did you understand, in the negotiation with Mr. Forbes concerning the judgment, that the assignment was for his benefit entirely, as you have stated?

*A.* Mr. Forbes said, that he wished to be released from this also; I think he also spoke of his being worth nothing, and unable to do any thing as long as these claims were pending. That he was dependent on his father-in-law, Mr. Judd, for support. I recollect I also asked him seventy-five dollars. He said he could not do so, but that he would give his note for the rest, as the only thing he could do, as he had no more, and the old man, his father-in-law, Mr. Judd, from whom he had received the fifty dollars, would not forgive him if he knew of his giving

19

any thing more for the debt. He received the fifty dollars in my presence from a clerk of Mr. Judd's, in his counting room. I received it at the counting room of Mr. Judd.

*Q.* Have you signed other papers than this assignment as attorney for Charles Green?

*A.* I believe this is the only paper, except notes and checks, which I signed while a clerk of my brother, and except in a single instance, when I received a special power of attorney to convey lands for him in Maine and New-Hampshire, when I was about going to those states. I never signed for him as his attorney any other assignment of this kind, nor to the best of my recollection any other papers than those above mentioned.

*Q.* During your agency for your brother, did you act as his general agent in receiving and making payments for him?

*A.* I did.

*Q.* Was any entry made in the books of your brother of the receipt of the fifty dollars?

*A.* No, sir; I left town very soon after receiving it. On my return to the city, after an absence of about two months, I found that Mr. Barrett, who was formerly book-keeper of my brother, had charge of his books again. I called on him and mentioned the receipt of the fifty dollars, and also the amount of the note for $27.37, and suggested to him to credit those sums to the account of Kelly & Forbes. He replied, that during my absence my brother had received notes from Mr. Manning and Mr. Patten, relative to this assignment. Mr. Barrett further said, that my brother was dissatisfied with the arrangement: that he had given me no authority to make it, and had never sanctioned it. No entry was ever made of the receipt of the money or the note in my brother's books.

*Q.* How did you first know that there was a fund in court, on which the judgment in question was a lien?

*A.* I learned it from Mr. Manning, on my calling upon him, which was the day previous to my seeing Mr. Patten.

*Q.* Did your brother ever dissent from any other settlement of a debt made by you except the one in question?

*A.* I never to my recollection compromised any other debt

than the one in question. In one instance, in a case where a person had failed, my brother handed me a note, saying I might have whatever I could get for it; and in that case I received less than the full amount, or whatever I could get for it, for my own benefit.

*Q.* Had your brother any clerk or agent at the time of the assignment except yourself?

*A.* At the time of the assignment, my brother had no clerk, nor did I consider myself his clerk, as he was doing no business.

*Q.* Was your brother, from any and what cause, incapable at that time of attending to his own business?

*A.* He was capable of transacting his own business then and always, as far as I knew.

*Q.* Why then did you attend to his business, as his general agent?

*A.* I did not attend to his business at that time as his general agent, because he had no business. He had been out of business two years.

[Being cross-examined by Mr. Manning, on the part of Charles Green, the witness deposes as follows:]

*Q.* When you speak of your acting as the general agent of your brother, do you or not mean, that you were such general agent while you were a clerk of your brother's in his store, and while he was transacting business?

*A.* I was his agent when he was in business some two or three years since. While I was a clerk in his store I was not in the habit of making entries in the books, except occasionally, as he had a clerk in his store expressly for that purpose. It was Mr. Barrett.

*Q.* Did you know that a judgment had been obtained on the claim, before Mr. Forbes informed you of it?

*A.* To the best of my recollection, I was not aware that any judgment had been obtained against the parties till after my return.

*Q.* When you made the assignment, did you know that the claim was a lien on any real estate?

*A.* I did not.

*Q.* Had you any knowledge of the interest of Mr. Kelly in

Howland *agt.* Ayres and others.

the mortgaged premises sold in this cause, or of Mr. Kelly's having any real estate in this city or elsewhere?

*A.* I was entirely ignorant of such mortgage, or of Mr. Kelly's having any real estate.

*Q.* When you executed the assignment in question, had you any power or letter of attorney from your brother, authorizing you to sell, assign, or compromise this judgment?

*A.* No; I had not.

*Q.* Had either Mr. Kelly or Mr. Forbes, prior to the assignment in question, made any offer for the settlement or compromise of this judgment, or the claim on which it was founded?

*A.* Mr. Forbes, some months after the failure, called at my brother's office, and made me some proposals for the liquidation of the notes which my brother held against him. The exact amount which he offered to pay I don't recollect. The proposition was made to me, I communicated it to my brother, who refused to accept it; soon after, I now recollect, my brother took those notes to his lawyer to be sued. I think it was to Mr. Floyd. I can not say how long it was after Mr. Forbes's failure.

*Q.* Did offers, or propositions of compromise, come from Mr. Kelly?

*A.* Not that I recollect. Kelly was out of town.

*Q.* Do you or not know of Mr. Kelly's having made any other, and what offers, as to the claims against Kelly & Forbes, and when were such offers made?

*A.* About four years since, I should think, Mr. Kelly and Forbes offered drafts on Paine & Ames for, as I think, fifty per cent. of the claims, which offer I made known to my brother for his acceptance or refusal. His reply was, he would not accept of the drafts, nor any thing short of the full amount.

[Being again examined by Mr. Seely, the witness deposes:]

*Q.* In those cases where Kelly did give drafts on Paine & Ames, were they accepted by Paine & Ames?

*A.* I have heard that they were accepted, but were not paid when due.

*Q.* Did you execute the assignment in question before you left the city?

*A.* I did.

Howland *agt.* Ayres and others.

*Q.* How do you reconcile that fact with what you have just stated above, that you were not informed of any judgment until your return?

*A.* I only knew this, that there were notes, one or two in existence, against Mr. Forbes, and I supposed the assignment was for the notes; I took his word as to the assignment; I don't think that I read it; I only looked at some parts of it. I did not know there was a judgment; if I had known it before, it had escaped me.

[Being again examined by Mr. Manning, the witness deposes:]

*Q.* As to the drafts on Paine & Ames, of which you have spoken, which you state you heard were protested, were they or not, after being protested for non-payment, paid or secured?

*A.* I have been informed by the assignees of Kelly & Forbes, that the amount of them had been paid or secured.

*Walter C. Green,* being again produced and examined on the part of the claimant, Charles Green, deposes as follows:

*Q.* Was Charles Green a merchant in the city of New-York in the year 1830?

*A.* Yes, sir. He was a merchant in general commission business.

*Q.* Who lodged the power of attorney from Charles Green to you in the United States Bank?

*A.* I do not know, but presume my brother lodged it.

*Q.* Was it ever in your possession?

*A.* Not to my best recollection.

*Q.* Did you ever see it, or read it, or hear it read?

*A.* I do not recollect that I ever did; I only remember that Charles Green told me he had lodged a power in the several banks.

*Q.* Did he tell you for what purpose he had lodged the powers in the banks?

[The question is objected to by the counsel of the claimants, Brentnall and Decasse and Miege, and is overruled by the master.]

*Q.* Who put the claim of Charles Green against Kelly and Forbes in suit?

*A.* I presume my brother, Charles Green, or that it was done by his order, though I know nothing about it.

*Q.* Did you ever use or act under these powers, except for banking purposes?

*A.* Never, to my knowledge.

*Horace D. Forbes* was then sworn on his *voire dire* and afterward in chief. The substance of his testimony was, that the negotiation and transfer of the judgment to Henry W. Brentnall, who was his (Forbes) brother-in-law, was made for the exclusive benefit of Mr. Judd, his father-in-law. That he (Forbes) nor Brentnall had no pecuniary interest in it. The assignment was held by Brentnall in trust for Mr. Judd.

The assignment of the judgment to Brentnall and the power of attorney from Charles Green to Walter C. Green, deposited in the United States Branch Bank, were then proved, as follows:

" This Indenture, made the 24th day of April, 1835, between Charles Green, of the first part, and Henry W. Brentnall, of the city of New-York—Whereas the said party of the first part, on the 23d June, 1832, recovered judgment in the superior court against Hezekiah Kelly and Horace D. Forbes, for the sum of three hundred and eighty-six dollars damages and costs —now this indenture witnesseth, that the said party of the first part, in consideration of fifty dollars, to him duly paid, have sold, and by these presents do assign, transfer and set over, unto the said party of the second part, and his assigns, the said judgment, and all sum or sums of money that may be had or obtained by means thereof, or on any proceedings to be had thereon; and the said party of the first part do hereby constitute and appoint the said party of the second part, and his assigns, his true and lawful attorney irrevocable, with power of substitution and revocation, for the use, and at the proper costs and charges of the said party of the second part, to ask, demand, and receive, and to sue out executions, and take all lawful ways for the recovery of the money due or to become due on the said judgment; and, on payment, to acknowledge satis-

faction, or discharge the same and attorneys, one or more under him, for the purposes aforesaid, to make and substitute, and at pleasure to revoke, hereby ratifying and confirming all that his said attorney or substitute shall lawfully do in the premises; and the said party of the first part doth covenant that he will not receive or collect any, or any part thereof, nor release or discharge the said judgment, but will own and allow all lawful proceedings therein, the said party of the first part harmless of, and from all costs in the premises.

"In witness whereof, the party of the first part has hereunto set his hand and seal the day and year first above written.

(Signed)   "CHARLES GREEN, [L. S.]

"*By his Attorney,*

"WALTER C. GREEN.

"Sealed and delivered in the presence of

"ALEXANDER KNIGHT."

"Know all men by these presents, that I, Charles Green, of the city of New-York, merchant, have made, constituted, and appointed, and by these presents do make, constitute, and appoint, Walter C. Green, of the city of New-York, my true and lawful attorney, for me, and in my name, place, and stead, and to my use to do, transact, and perform every act, matter, deed, and thing whatsoever, which I myself might or could lawfully do, if personally present—and also to make, execute, sign, seal, deliver, draw, subscribe, endorse, accept, and negotiate, all bills, bonds, drafts, checks, notes, acceptances, transfers, assignments, compositions, releases, discharges, and other instruments whatsoever, which he may deem useful, necessary, or advantageous, and to collect and receive all moneys due, or which may become due to me, with power of substitution and revocation.

"Giving and granting unto my said attorney, and to his substitutes, full power and authority in the premises; hereby ratifying and confirming all and whatsoever my said attorney, or his substitute or substitutes, should lawfully do in the premises in virtue thereof.

"In witness whereof, I have hereunto set my hand and seal,

Howland *agt.* Ayres and others.

this twelfth day of January, in the year of our Lord one thousand eight hundred and thirty.

(Signed) " CHARLES GREEN, [L. S.]

" Sealed and delivered in the presence of

" AUGUSTUS FLOYD."

The chancellor, on affirming the decree of the vice chancellor, gave the following opinion :

THE CHANCELLOR.—This is an appeal by C. Green from an order of the assistant vice chancellor of the first circuit, upon exceptions to a master's report, as to the right to surplus moneys arising from a sale of the mortgaged premises, under a decree. And the only question necessary to be considered is, whether the power of attorney from the appellant to his brother, W. C. Green, was sufficient to authorize the latter to assign the judgment in question. The power is not one to do a specific act, and concluding with general words, which general words are usually restricted to the specific object of the power. But it is a general power in the most extended sense of the term. It commences by making the brother the true and lawful attorney for the appellant, " for me, and in my name, place, and stead, and to my use, to do, transact, and perform every act, matter, deed, or thing whatsoever, which I myself might or could lawfully do if personally present; and, also, *to make, execute, sign, seal, deliver, draw,* subscribe, endorse, accept, and negotiate, all bills, bonds, drafts, checks, notes, acceptances, *transfers, assignments, compositions,* releases, and other instruments whatsoever, which he may deem useful, necessary, or advantageous; and to collect and receive all moneys due, or which may become due to me, with power of substitution and revocation." And it concludes with the general grant to such attorney, of full power and authority in the premises. Under this general power there can be no doubt that the attorney had as much authority to execute an assignment of the judgment, upon receiving the whole or a part thereof, or to make an accord and receive a part of the judgment in satisfaction of the whole, as he had to draw or endorse a note, or to do any other act for the constituent.

Nor does it lie in the mouth of the constituent, or of his attorney, to say, this assignment was not made by virtue of this power, for the assignment purports to be made under the hand and seal of Charles Green, the party of the first part therein, and is subscribed by the attorney thus: " Charles Green, by his attorney, Walter C. Green." [L. S.] By the manner of executing the instrument, therefore, W. C. Green held himself out to Forbes as being the attorney of his brother. And it is wholly incredible, that he did not at that time believe he had a power which authorized him to execute the assignment as the attorney of his brother, and that he intended to commit a fraud upon Forbes, by acting in a character which he did not possess.

Again, it is immaterial whether this instrument was good as an assignment to be filled up in the name of such person as Forbes should think proper to insert therein, or not. For if that instrument is invalid as an assignment, for any reason, the agreement between W. C. Green and Forbes, and the payment of the $50, and the giving of the note, would operate as an accord and satisfaction, which the attorney had a right to make and receive, under the power. The whole interest of the appellant in the judgment was, therefore, extinguished, in one way or the other.

The order appealed from must be affirmed, with costs, and the proceedings are remitted to the vice chancellor of the first circuit.

*R. Manning, Attorney & Counsel* for appellant, *Chas. Green.*

### *First.*—POWER.

1. A person dealing with an agent, or attorney in fact, is bound to know whether he is such; and the nature and extent of the authority given by the principal or constituent; and to that end he should require the attorney to produce the power for his inspection. (3 *Hill*, 262, 279; 5 *Ves.* 213.) In the latter, the lord chancellor says, "I take it not merely to be a principle of the law of *England*, but by the *Civil Law*, that if a person is acting *ex mandato*, those dealing with him must look to his mandate."

2. There is no substantial difference between a special power of attorney to do a particular act, and a general power

to do all acts in a particular business. And on this principle, a general power, in terms, has been cut down to a particular purpose, according to the intent of the party giving the power. (*The North River Bank* v. *Aymar and others*, 3 *Hill's Rep.* 262; *Story on Agency*, 70; *Atwood* v. *Munnings*, 7 *Barn. & Cress.* 278; 1 *M. & R.* 78; 8 *Wend.* 494; 1 *Taunt.* 347; 2 *Cow. Rep.* 200, 233.)

The object of the power of attorney in question in this case, was to authorize Walter C. Green to do all acts for Charles Green in a particular business, viz. : his banking business at the Branch Bank of U. S., in the city of New-York, in which said Charles Green had deposited said power for that·purpose only. A like power of attorney was also deposited by him in the custom-house, and in several other banks of the city of New-York. (*See p.* 11, *fol.* 4; *p.* 12, *fols.* 10, 11; *p.* 18, *fol.* 31; *p.* 23, *fols.* 46, 47.)

A power of attorney, like any other deed, can take effect only by, and according to its delivery, and is limited and restricted accordingly.

In view of these general principles, and of the facts and circumstances of the case, it is contended, that the assignment of the judgment in question is void as to Charles Green, because Walter C. Green was not authorized to make it, and because it was a fraud on Charles Green.

3. It appears that on the 14th day of July, 1832, Charles Green recovered this judgment in the superior court of the city of New-York against Hezekiah Kelly and Horace D. Forbes, for the sum of $386.01 damages and costs. And, that, on the 1st of March, 1836, the master to whom it was referred, reported to the court, that there was then due on this judgment the sum of $484.03, and that it was a lien to that amount on the surplus moneys paid into court in this cause, and that the claimant Charles Green was the owner of the judgment and entitled to the money.

4. It appears, also, that one Henry W. Brentnall claimed title to this judgment by an assignment of it to him for $50, by Walter C. Green, as attorney for Charles Green, made on the 24th day of April, 1835, of which Charles Green was igno-

rant until it was produced before the master. And he denies that Walter C. Green had any authority for making it.

5. It was conceded on the other side, that this assignment does not bind Charles Green, unless Walter C. Green was invested with adequate power to make it. And. for that power they referred to a power of attorney on file in the office of the Bank of the United States, in the city of New-York, deposited there by Charles Green himself, on the 12th day of January, 1830, and there remaining on file on the 23d of January, 1836, which accidentally came to their knowledge in the course of their examination of their witness, Walter C. Green, whom they produced to prove that he was authorized to make the assignment. (*P.* 18, *fol.* 31, *and p.* 26; *p.* 23, *fol.* 46.)

6. But Walter C. Green expressly testified, that he did not act under that power, or any other written power, when he compromised this judgment with Forbes, and signed. the instrument prepared by Forbes for transferring it to Brentnall, as Forbes's trustee. And that he never acted under said power except for banking purposes. That it never was delivered to him; that it never was in his possession; that, he never saw said power, or heard it read, and was ignorant of its contents, excepting that he had been informed by said Charles Green that he had lodged powers of attorney in certain banks in the city of New-York and at the custom-house, to authorize him to transact for him his custom-house and banking business, respectively. And, moreover, this power of attorney had then become dormant, for its authority had terminated more than two years before, when said Charles Green had retired from business, and Walter C. Green was no longer in his employ. For then the business, for the transaction of which the power had been given, was executed; and the power itself remained in the possession, and was the property of the bank, as a document. (*See p.* 12, *fols.* 8, 9, 10, 11; *p.* 16, *fol.* 22; *p.* 17, *fols.* 26, 27; *p.* 18, *fol.* 31; *pp.* 23, 24, *fols.* 46, 47, *and p.* 26; *Kent's Com.* 2 *v.* 643.)

7. As this power of attorney was never delivered to Walter C. Green, nor in his possession, but only to the United

States Bank, it was not a general power to him, except for the purposes for which it was delivered to the bank.

8. The intent of the person who gives a power of attorney is to govern its construction and use. This is a well settled rule. And it is manifest, that this power was never intended by Charles Green to be applied to the compromise, or collection or transfer of this debt, or judgment, after his repeated rejections of Forbes's offers. And especially, since Forbes a year or two before had offered 50 per cent., which Charles Green had rejected, and put the claim in suit and recovered the judgment in question, declaring he would take nothing short of the full amount. (*See p.* 17, *fols.* 27, 28; *p.* 10, 11, *fols.* 2, 3, 4.)

9. And this intent as to the power is further manifested by another circumstance: That when shortly after this assignment, Walter D. Green went to the states of Maine and New-Hampshire, to sell and convey certain lands for the said Charles Green, he was furnished with a power of attorney for the purpose. (*See p.* 15, *fols.* 20.)

10. It has been said that the safety of persons dealing with attorneys in fact, requires that this assignment should be sustained. But it is contended that this position is not tenable, and there is no rule of law to support it. Walter C. Green proves, (and he is their own witness,) that he assigned the judgment to Forbes without any authority from Charles Green, who, he says, was entirely ignorant of it; and when he informed him of it, he refused to ratify it. And when he told Forbes of this, and offered to return the $50 and the note, Forbes did not pretend that he had been either wronged or deceived by him, but said he had expected to have been benefited by the assignment. (They neither of them appear to have had any knowledge or reference to this power, in this transaction, *p.* 13, *fol.* 13; *p.* 14, *fols.* 14, 17, 18.)

*Second.*—ASSIGNMENT IN BLANK.

1. But, supposing this power to be sufficient, and that Walter C. Green acted under it in making the assignment, yet the assignment is invalid, because it was executed in blank

Howland *agt.* Ayres and others.

without any description of the judgment, or designation of the assignee, and in that state delivered to Forbes.

### FRAUD.

☞ No proof that Forbes knew it was a lien on Kelly's land. ☜

2. It is void, also, because it was obtained from Walter C. Green by the application and misrepresentation of Forbes, after his propositions had been repeatedly rejected by Charles Green. And Walter C. Green was ignorant of the value of the judgment which Forbes represented to him to be worth nothing; when in fact it was good to the full amount of it, as a lien on the real estate of Kelley.

3. The justice of the case requires, that Charles Green should not be held bound by this assignment. For, while Forbes loses nothing, but in fact gains the object he professed to have in view in buying up the judgment, Green is defrauded of a just demand.

### NOT ACCORD AND SATISFACTION.

4. But it is said by the chancellor, that if this assignment, for any reason, is invalid, the agreement between Walter C. Green and Forbes, and the payment of the $50 by the latter, and giving his note for $27 more, would operate as an accord and satisfaction, and extinguish the whole interest of the appellant in the judgment. But this position is disputable. For, according to the authorities, the acceptance of a less cannot be a satisfaction in law of a greater sum then due; nor can it operate as an extinguishment of the debt. There is, therefore, no merger or extinguishment of this judgment. (*Fitch* v. *Sutton,* 5 *East,* 230; *Cumber* v. *Wane,* 1 *Str.* 426; *Heathcote* v. *Crook-shanks,* 2 *J. R.* 449; *Seymour* v. *Minturn,* 17 *J. R.* 169; *Boyd* v. *Hitchcock,* 20 *J. R.* 76.)

5. The order or decree appealed from is also erroneous, because it directs the said fund in court to be applied to the payment of a judgment in favor of Lewis Decasse and Pierre A. Miege, against Hezekiah Kelly and *Horace D. Forbes:* whereas, in the master's said report no such judgment is men-

tioned; the judgment there stated is against Hezekiah Kelly only.

[☞ You have no interest in that question, if your judgment is assigned. ☜]

Now, a judgment against two cannot be taken to be the same as a judgment against one only. (*Readshaw* v. *Wood,* 4 *Taunt.* 13.)

6. The decree of the chancellor, and also that of the assistant vice chancellor, ought to be reversed, with costs, and the master's report confirmed; and directions given for an order to be entered, directing the clerk of the first circuit to pay to Charles Green or his solicitor, out of the said surplus fund, the amount of said Green's judgment, as reported by the master.

R. Manning, *of Counsel for appellant.*

*Edward H. Seely, Attorney, and*
*W. A. Seely, Counsel* for respondents, Decasse & Miege.

*First.* The power of attorney by Charles Green to Walter C. Green was in form and terms sufficient to authorize the latter to make the assignment—or to make an accord and satisfaction as to the judgment, and the claim of Charles Green on the surplus funds in court became thereby extinguished.

*Second.* It did not lie in the mouth of Charles Green or of Walter C. Green to say that the payment was not made in pursuit of the powers given.

*Third.* That the statement of Walter C. Green given in evidence before the master, that he did not believe when he executed the assignment he was authorized to do so, and also that he did not know that he had executed an assignment of the judgment, were wholly incredible.

*Fourth.* The procurement by Forbes as a defendant in the judgment, of the assignment for his own benefit, satisfied and extinguished all claim on the judgment by or for him, and thus gave the judgment of Decasse & Miege the sole right to the fund in court, subject to the $25 directed to be paid to Brentnall.

*Fifth.* It is manifest from the evidence before the master that the appellant was induced to deny the power and to repudiate

the assignment in consequence of the unexpected appearance of the surplus fund in court, after the execution and delivery of the assignment, and the whole face of the evidence is marked with a want of frankness and with insincerity.

W. A. SEELY, *of Counsel for respondents.*

☞ Assignment—though in blank, it was good to extinguish the judgment—being given for the benefit of Forbes, the debtor—authority to fill up blanks. ☜

DECISION.—Decree affirmed unanimously.

NOTE.—Where an assignment of a judgment was executed by " C. G. [L. S.] by his attorney, W. C. G. ;" and it appeared that W. C. G. had a general power of attorney from C. G., which was claimed by C. G. to have been in fact restricted to a particular business, of which this assignment was not within its scope—*held,* that by the manner of executing the assignment, the constituent and his attorney were estopped from saying that the assignment was not made by *virtue of the power.*

A negotiation and agreement by the attorney to receive part payment or accord and satisfaction for a judgment belonging to his constituent under such a power, and the actual receipt of such payment—*held,* valid and binding on the constituent.

*Not reported.*